FILED

JUL 0 9 2020

PETER A. MOORE, JR. CLERK
US DISTRICT COURT, EDNC
BY_____DEP CLK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

SIDNEY B. HARR,                          )
                                         )
            Plaintiff Pro Se,            )
                                         )
    v.                                   )        Case No.: 5:20- Cv-362- m
                                         )
WRAL-5 NEWS, and                         )
JAMES F. GOODMON,                        )
                                         )
            Defendants.                  )
_____)

## COMPLAINT CIVIL RIGHTS VIOLATIONS, LIBEL, AND DEFAMATION
## JURY TRIAL DEMANDED

### I. Jurisdiction

Jurisdiction in this case is established by Federal Question 28 U.S.C. § 1331 (specifically the Plaintiff alleges that his First Amendment Rights to Freedom of Speech and Expression were violated by Defendants) and violation of Civil Rights 28 U.S.C. § 1343 (specifically the discrimination by Defendants based upon the Plaintiff's thoughts, beliefs, opinions, and on his race – Plaintiff being an African American). Procedural violations by the Wake County Superior Court Civil Division favoring Defendants, deprived Plaintiff Pro Se of his Seventh Amendment Right to a trial by jury, and though not criminal in nature, Plaintiff Pro Se's Sixth Amendment Right to due process was not honored.

### II. Parties

Plaintiff Pro Se:
    Name: **Sidney B. Harr**
    Address: 116 Saint Mary's Street, # 703

1

Raleigh, NC 27605

Defendants:

> Name: **WRAL-5 News**
>
> Street Address: 2619 Western Boulevard
>
> Raleigh, N.C. 27606
>
> Mailing Address: P.O. Box 12000
>
> Raleigh, N.C. 27605
>
> Name: **James F. Goodmon**
>
> Street Address: 2619 Western Boulevard
>
> Raleigh, N.C. 27606
>
> Mailing Address: P.O. Box 12000
>
> Raleigh, N.C. 27605

## III. Introduction

1.   Plaintiff Pro Se Sidney B. Harr, M.D. (hereinafter "HARR") now seeks relief from THIS COURT following rulings by the Wake County Superior Court's Civil Division (hereinafter "WAKE COURT") in denying him adjudication by a jury on his libel and defamation complaint against Defendants.

2.   HARR is firmly of the belief that this deprivation of his Seventh Amendment Right by WAKE COURT was racially based because he is an African American and Defendants are a major corporation and a prominent and successful white businessman; the libel is represented in Defendants' online WRAL.COM article dated July 4, 2016 titled "Court chastises supporter of Duke Lacrosse accuser." *(Exhibit A)*

3.   In support of HARR's assertion of racial bias is the fact that WAKE COURT, under Honorable Superior Court Judge G. Bryan Collins (hereinafter "COLLINS"), was unable to legally support its July 17, 2017 decision to grant Defendants' Motion to Dismiss HARR's Complaint.

- 2 -

4.     COLLINS' one-page/two-paragraph/four-sentence Order simply stated that plaintiff failed to state a claim upon which relief could be granted; a defense based on N.C.G.S. Statute § 12 (b) (6).

5.     COLLINS could not elaborate on his ruling because facts to buttress it did not exist – in other words HARR clearly presented factual evidence to prove elements requisite for libel and defamation existed; namely that the publications made by Defendants were materially false and that HARR suffered ridicule, scorn, and physical threat due to the false publications.

6.     An additional complication from the initial filing came from WAKE COURT's Clerk of Court's Office which inexplicably listed HARR as being represented by Charlotte attorney William D. Cannon (hereinafter "CANNON") and directing all court legal correspondence to CANNON; CANNON not forwarding correspondence to HARR or notifying HARR of the mistaken assignment and delivery.

7.     Neither WAKE COURT nor CANNON responded to HARR's queries about the mix-up which contributed to HARR's subsequent failure in producing an Appeal that conformed to appellate complexities required for such a filing.

8.     Since the initial ruling on HARR's Complaint was not entered by a jury and because COLLINS did not base his one-page/two-paragraph/four-sentence Order on merits of the case, HARR resubmitted his Complaint, essentially the same pleading, in the same Court.

9.     At a hearing during the second case, *res judicata* was raised as a defense and accepted by WAKE COURT despite HARR's argument that *res judicata* was not applicable due to absence of it being based on merit in the initial presentation before the COLLINS Court.

10.     Having been presented with Rules of the Appellate Court after the summary dismissal of his second filing, HARR filed a perfected Appeal which ran its course until finally

being denied by North Carolina Supreme Court in its April 1, 2020 ruling on HARR's Petition for Discretionary Review.

11.     With the national conscientious focused on racial injustice following the murder of George Floyd by Minneapolis police, it is apparent that systemic racism is not limited to policing and extends to attorneys and even judge.

12.     HARR believes that he has been victimized not only by Defendants, but by a justice system wherein the Motion to Dismiss N.C.G.S. Rule 56 (b) is routinely used to deny certain plaintiffs (based upon race and/or other parameters) access to the courtroom despite having cases of merit that are likely to succeed before an impaneled jury.

13.     Deprived of justice in the State court, HARR now seeks relief before THIS COURT and presents his case in the following.

## IV. <u>Statement of the facts</u>

14.     On the evening of March 13, 2006, at a single-dwelling bungalow located on Buchanan Boulevard in Durham, NC, its renters (members of the Duke University lacrosse team) hosted a beer-guzzling/stripper ogling Spring Break bash, and for entertainment purposes hired, through an escort service, two exotic dancers to strip before the approximately fifty male guests anticipated to attend.

15.     One of the two African American female dancers hired was Crystal Mangum (hereinafter "MANGUM"), a single mother of two at the time and a student at North Carolina Central University in Durham.

16.     Shortly after the improvised dance routine between the two, who had just met, began, several of the men in attendance began making dehumanizing and humiliating utterances

- 4 -

and displaying lewd and profane gestures; actions which drove the two black dancers to the bathroom seeking refuge.

17.     Partygoers, having paid a substantial amount for approximately an hour or so's worth of sensual gyrating/dancing/stripping, were upset with the apparent brevity of the performance and demanded return of their payment.

18.     At some point, several attendees entered the bathroom entrapping MANGUM, who she claimed then sexually assaulted her, possibly using an instrument (broomstick).

19.     Both women left the house with their payment confiscated, and MANGUM went to the Duke University Hospital emergency department where she stated that she had been sexually assaulted whereupon she underwent a rape kit examination.

20.     MANGUM did not know her assailants, but demanded that criminal charges be filed in her case against three men; Durham Police investigating and then-Durham District Attorney Mike Nifong (hereinafter "NIFONG") taking the lead in the prosecution to assure to his satisfaction that the case would not be swept under the rug due to the prestigious/privileged profile of the potential defendants.

21.     Shortly after the investigation was begun and before suspects were identified, the NC State Bar (hereinafter "BAR") began its own investigation of NIFONG for commenting about the case with the media; NIFONG explaining that he attempted to essentially shame the partygoers into providing the identities of the assailants. This strategy by NIFONG did not work as student-athlete partygoers almost instantaneously had legal representation and were advised to remain silent – not difficult for the close-knit athletic teammates.

22.     MANGUM subsequently made an identification of three individuals from a photo lineup, and based upon it, NIFONG moved forward with the prosecution of a trio of athletes

although he had been cautioned by colleagues to drop the investigation.

23.    By December 2006, action taken by BAR against NIFONG forced the prosecutor to withdraw from the case and he subsequently turned the criminal case over to the NC Attorney General's Office in January of the following year.

24.    After approximately three month of a supposed investigation, Attorney General Roy Cooper (hereinafter "COOPER") held a news conference on April 11, 2007 during which he promulgated that his office was dropping all criminal charges in the case, and he took the unprecedented step of proclaiming that the three Duke student-athlete defendants were "innocent."

25.    The media took COOPER's proclamation to mean that MANGUM lied about being sexually assaulted, and many began branding her as the false accuser; the three Duke Lacrosse defendants meanwhile were lionized as innocent victims... this a decade before emergence of the #MeToo Movement.

26.    NIFONG was portrayed in the media as unethical and having an ulterior motive for pursuing the prosecution of the Duke Lacrosse case; the collateral purpose of winning the black vote for an upcoming November 2006 election in hopes of holding onto his D.A. position.

27.    In spring of 2007, NIFONG was forced to resign from his elected position as district attorney, and by that summer was disbarred by BAR, served 24-hours in jail for being in contempt of court, and forced into bankruptcy after being denied prosecutorial immunity.

28.    COOPER later joined with U.S. Congressman Walter Jones in an unsuccessful attempt to get the Federal Department of Justice to criminally investigate NIFONG for depriving the three Duke Lacrosse defendants of their civil rights.

29.    A retired HARR, who had moved, in late 2005, to Raleigh, NC, to be with his

daughter following the death of his wife, had taken interest in the criminal cases within the state; cases including those of James Arthur Johnson, Erick Daniels, Fred Brown, Greg Taylor, and Crystal Mangum.

30.     HARR was spurred into activism on criminal justice issues when in June 2008 he learned that NIFONG was the *only* prosecutor to be disbarred by BAR since its inception in1933.

31.     It was then, in June 2008 that HARR, with Durham activist Victoria Peterson, co-founded the *Committee on Justice for Mike Nifong*... a grass roots organization with a loosely defined mission to encourage BAR to unilaterally and unconditionally reinstate NIFONG's license to practice law in North Carolina.

32.     HARR basically ran the organization by recruiting members, providing tee-shirts with the j4n logo and j4n business cards to members, and managing online web and blog sites.

33.     HARR, a Raleigh resident, not infrequently traveled by bus to Durham's Duke University to meet with and engage in friendly debate Duke Law Professor James Coleman (hereinafter "COLEMAN"), an outspoken critic of NIFONG and his handling of the Duke Lacrosse case.

34.     HARR found COLEMAN to be extremely affable and subsequent visits held diminished attention toward NIFONG and the Duke Lacrosse case and increasingly centered on conversational topics shared by friends. Thereafter, whenever HARR was on the Duke University campus, he would drop by COLEMAN's office for a brief visit to say "hello."

35.     Early-on HARR began going to the Duke Law School to meet with professors to discuss NIFONG and the Duke Lacrosse case – activity that was not widely embraced; partially and possibly due to the fact that whenever HARR went to Durham and Duke University he made a point to wear his j4n tee-shirt. HARR even tried unsuccessfully to meet with the dean of

- 7 -

Duke's law school David F. Levi (hereinafter "LEVI").

36.     Additionally, HARR began to attend many of the conferences held at the law school, so by 2010, it was not unrealistic to believe that HARR was known by many at Duke Law School as a supporter of NIFONG.

37.     During a three-day John Hope Franklin conference held at the law school building from April 8 through 10, 2010, HARR noticed an announcement for an interview with U.S. Supreme Court Justice Stephen Breyer (hereinafter "BREYER") that was scheduled for April 14, 2010; to be open to the public on a first-come/first-served basis.

38.     On April 12, 2010, two days prior to the interview, HARR wrote a laudatory letter to both Duke University President Richard Brodhead (hereinafter "BRODHEAD") and LEVI to express how much he enjoyed the Franklin conference, which had concluded two days earlier, and other offerings at the law school.  As a show of his support for the events open to the public, HARR stated in his letter that he planned to attend the BREYER interview set for April 14th. *(Exhibit B)*

39.     HARR left Raleigh early in the morning of April 14, 2010 carrying his camera and audio-recorder, and, per his custom when visiting Durham, wearing his j4n tee-shirt.

40.     Upon arriving on campus, HARR went to COLEMAN's office and on finding it empty, returned to the lobby to await the conference to begin; HARR read from a pocket novel and discussed NIFONG and the Duke Lacrosse case with a few interested-appearing law students and others.  To those showing interested, HARR gave out his j4n business card that had the online address for his web and blog site plus his contact information; handing out a total of about half dozen during the approximate three-hour wait for the interview to begin.

41.     Sitting approximately a third of the way from the front of the stage, HARR took

- 8 -

Duke's law school David F. Levi (hereinafter "LEVI").

36.     Additionally, HARR began to attend many of the conferences held at the law school, so by 2010, it was not unrealistic to believe that HARR was known by many at Duke Law School as a supporter of NIFONG.

37.     During a three-day John Hope Franklin conference held at the law school building from April 8 through 10, 2010, HARR noticed an announcement for an interview with U.S. Supreme Court Justice Stephen Breyer (hereinafter "BREYER") that was scheduled for April 14, 2010; to be open to the public on a first-come/first-served basis.

38.     On April 12, 2010, two days prior to the interview, HARR wrote a laudatory letter to both Duke University President Richard Brodhead (hereinafter "BRODHEAD") and LEVI to express how much he enjoyed the Franklin conference, which had concluded two days earlier, and other offerings at the law school.  As a show of his support for the events open to the public, HARR stated in his letter that he planned to attend the BREYER interview set for April 14th.
*(Exhibit B)*

39.     HARR left Raleigh early in the morning of April 14, 2010 carrying his camera and audio-recorder, and, per his custom when visiting Durham, wearing his j4n tee-shirt.

40.     Upon arriving on campus, HARR went to COLEMAN's office and on finding it empty, returned to the lobby to await the conference to begin; HARR read from a pocket novel and discussed NIFONG and the Duke Lacrosse case with a few interested-appearing law students and others.  To those showing interested, HARR gave out his j4n business card that had the online address for his web and blog site plus his contact information; handing out a total of about half dozen during the approximate three-hour wait for the interview to begin.

41.     Sitting approximately a third of the way from the front of the stage, HARR took

- 8 -

several photos while audio-recording the interview; acting as all others similarly situated. After the hour-long event BREYER exited stage left while HARR proceeded en masse with other attendees to the rear exit of the lecture hall with the intent of catching the bus and returning home to Raleigh

42.     Once in the lobby and heading for the building's exit, HARR was approached by a gentleman who introduced himself as Tom Breen, a writer for the Associated Press; Mr. Breen seeking HARR's opinion about the interview.

43.     While providing a favorable opinion of the event, HARR noticed a uniformed security guard standing approximately twenty feet away; the sight being unusual but which HARR attributed to the importance of the visiting guest interviewee.

44.     After expressing his opinions about the event, HARR spoke to the AP writer about NIFONG, and the two exchanged business cards.

45.     As the writer walked off, HARR started for the building's exit door when he was intercepted by the uniformed guard who told him that he had to leave the campus; the security guard unable to give a reason other than saying that the building manager wanted him to leave. HARR attempted to speak to the building manager but the security guard refused his request.

46.     As they walked to the building exit, HARR saw COLEMAN walking through the lobby and frantically waved him over; COLEMAN being in a hurry to catch an airplane.

47.     HARR took his audio-recorder from his bag and began recording his conversation with the security guard and COLEMAN at this time while moving in the direction of the exit.

48.     COLEMAN interceded on HARR's behalf, explaining to the security guard that he knew him, and by the time the trio had exited the building, a Duke campus patrol car pulled up to the the curb, having been summoned by the security guard.

-9-

49.     Having been threatened by the security guard with arrest several times, without a reason given other than for "trespassing," HARR was not taken into custody as COLEMAN mediated an agreement in which he vouched for HARR and told HARR he would talk with the building manager; the security guard telling COLEMAN that he was just doing his job – that he was told to get rid of HARR and that was what he was doing.

50.     Disregarding HARR's objections to being tailed, the security guard and campus police followed HARR until he boarded a city bus leaving campus with a final comment from security that he was nearly arrested three times.  *(Exhibit C)*

51.     This incident was pretty traumatic to HARR who realized that had it not been for COLEMAN coming to his rescue he would have been arrested on any number of trumped up charges which could have punitively had him incarcerated for an indefinite period of time with likely resultant emotional and even physical injury... Duke University is powerful and no one is going to take the word of HARR over words of lawyers representing the esteemed institution.

52.     In addition, HARR's planned arrest would probably be accompanied by negative Associated Press coverage that would irreparably discredit him and his j4n organization.

*53.*     HARR immediately informed most local media (possibly Defendants) about his brush with arrest in a premeditated ambush by Duke Law School that was motivated by racism and his support for NIFONG, but there was absolutely no coverage of the April 14, 2010 incident by any media outlet.  *(Exhibit D)*

54.     HARR was aware that before he could return to any event held on Duke property, that he would need to resolve this situation, so on or about April 19, 2010, five days following the incident, he wrote letters to BRODHEAD, LEVI, and Duke University's legal counsel seeking an amicable path forward to ensure any future campus visits by him or other NIFONG

- 10 -

supporters would not be unjustly subjected to harassment or arrest. HARR received no reply.

55. Years earlier when Duke University Political Science Chair Michael Munger (hereinafter "MUNGER") was running as a third-party gubernatorial candidate, HARR, appreciating his stance on criminal justice, became a supporter and met with him personally on a couple of occasions; and, as with COLEMAN, HARR would stop by his office when visiting the Duke campus.

56. HARR asked MUNGER to act as a liaison with Duke University by delivering on April 26, 2010 a proposal for resolving the incident in a way that would enable HARR and NIFONG supporters to attend activities on the campus and feel free of harassment or threats.

57. Michael Schoenfeld, Duke University Vice-president of Public Relations sent to HARR the only response from the university dated May 10, 2010, in which he claimed Duke committed no wrongdoing, that HARR was not arrested, that HARR had violated its rules against solicitation, and that campus police presence was in response to complaints from people to whom HARR had handed out his j4n business card earlier in the day. The confrontational and accusatory missive ended by stating HARR was welcome on campus public events as long as he adhered to university rules. *(Exhibit E)*

58. On May 15, 2010, HARR sent a letter to BRODHEAD, LEVI, and Duke University counsel stating that the May 10, 2010 was not satisfactory, thereby essentially putting the ball back into Duke's court. No response would be forthcoming from Duke University.

59. In mid-October 2010, approximately six-months following the incident at Duke Law School, a trespassing incident occurred at a Raleigh shopping mall when an interracial lesbian couple was ordered off the property by a security guard for sharing a kiss in public.

60. The couple was allowed to speak to the security guard's supervisor, and there was no threat of arrest or police presence.

61. Defendants and other media aggressively pursued this story, with daily updates for up to a week; the story reaching cable news stations and making national news. *(Exhibit F)*

62. The story about this discriminatory trespassing incident generated an outpouring of support from organizations and individuals alike; the ACLU explaining to HARR that although the incident took place on a privately owned shopping mall, the couple were standing on a public sidewalk when trespassed by the guard.

63. In short order the mall owner apologized to the couple, suspended the security officer, and acquiesced to all demands of the couple, one of whom was a lesbian rights leader... an outcome which HARR had hoped the media would have played a similar role in his discrimination/trespassing case.

64. As the one year anniversary of the Duke trespassing/discrimination neared, HARR, not having heard anything further from Duke University, proceeded to file a lawsuit on April 5, 2011 in order to be within any statute of limitations.

65. HARR notified Defendant WRAL-5 News and other media about his lawsuit filed in Greensboro's Federal Court for the Middle District of North Carolina, but there was absolutely no coverage of this story by any media outlet. *(Exhibit G)*

66. In U.S. District Judge Thomas D. Schroeder's (hereinafter "SCHROEDER") ruling of March 5, 2012, HARR's Complaint was summarily dismissed with SCHROEDER explaining in his Order: "What Plaintiff overlooks is that Duke University is a *private* institution, and thus Plaintiff was at all times on *private* property when the events took place." HARR's argument was that the event, though held on private property was open to the public which

- 12 -

transformed it, though temporarily, to a place of public accommodation. In opposing Defendants' stated "fact" that HARR was soliciting at the event, HARR maintained that he was acting as all others similarly situated.

67.     His case dismissed, HARR never got his day in court and he felt that the SCHROEDER ruling was not based on merit, so he decided to appeal the SCHROEDER decision to the Fourth Circuit Court of Appeals in Richmond, VA (hereinafter "FOURTH CIRCUIT"). It should be noted that sometime after his ruling on the case, SCHROEDER was admitted to the Duke Law School faculty.  *(Exhibit H)*

68.     Almost concomitantly with his initial April 5, 2011 filing of discrimination lawsuit against BRODHEAD et. al, MANGUM, on April 3, 2011, stabbed her alcoholic and intoxicated boyfriend Reginald Daye (hereinafter "DAYE") with a steak knife in self-defense during his jealousy-fueled enraged early morning attack.

69.     So, while working on his Pro Se appeal in the case against BRODHEAD et. al, HARR began actively advocating on behalf of MANGUM; HARR having met MANGUM a year earlier during a domestic altercation that netted her 90 days in the Durham County Detention Center on misdemeanor verdicts and a deadlocked jury on the serious felony first-degree arson charge.  (HARR had volunteered his services to her in the earlier 2010 incident because of her direct connection to NIFONG of whom he was a supporter.)

70.     On April 3, 2012, a couple of weeks following SCHROEDER's summary dismissal of his Complaint, HARR filed his Appeal with FOURTH CIRCUIT, however, having no concept of the complexities of such a filing, his appeal was totally deficient procedurally and several months later, on August 1, 2012, it was denied on procedure, not merit.

71.     On October 22, 2012, HARR filed a Pro Se Petition for Writ of Certiorari with the

- 13 -

U.S. Supreme Court. Again, the document being irreparably deficient, it was not accepted for review by the highest court on or about January 7, 2013; this ruling putting an end to the legal Pro Se odyssey by HARR that began with his initial filing on April 5, 2011.

72.     During the entirety of HARR's legal process there was absolutely no media coverage by Defendants or any other media outlet about HARR's discrimination/trespassing lawsuit against BRODHEAD, LEVI, and Duke University.

73.     Being denied his day in court by SCHROEDER's summary dismissal of March 5, 2012, and unsuccessful appellate actions, HARR filed his second similar discrimination complaint against BRODHEAD, LEVI, and Duke University.

74.     Defendants placed the bulk of their argument on the doctrine of *res judicata* with HARR countering that his case was summarily dismissed; the dismissal not based on merits of the case.

75.     The Magistrate Judge Joe Webster (hereinafter "WEBSTER") called for the parties to meet in an attempt to resolve the case amongst themselves and on April 11, 2014, HARR met with Defendants' attorneys at their Greensboro office; defense attorneys not acting in good faith for unlike HARR, who had prepared written proposals and expressed a willingness to negotiate, they made neither offers nor concessions.

76.     On April 23, 2014, WEBSTER held a motions hearing in the Durham Federal Courthouse, and ruled in favor of most of the motions made by Duke defendants' counsels... taking into advisement a motion regarding the merits of SCHROEDER's initial ruling with respect to *res judicata*.

77.     On May 28, 2014, WEBSTER filed his Recommended Ruling to U.S. District Judge Catherine Eagles (hereinafter "EAGLES") in which he favored granting of Duke

defendants' Motion to Dismiss.

78.     Due to health issues HARR was unable to timely file an Objection to Magistrate's Recommended Ruling, and on July 17, 2014, EAGLES granted Duke defendants' Motion to Dismiss. EAGLES further granted Duke defendants immunity from future similar filings against them by HARR, and threatened HARR with sanctions if he were to re-file against Duke defendants in this matter.

79.     On July 28, 2014, HARR manually filed a motion in the Greensboro Federal Court explaining his delay in filing an Objection to the Magistrate Recommendation, but despite it EAGLES filed a second Order dated August 4, 2014 to dismiss HARR's discrimination case.

80.     On September 15, 2014, HARR filed an appeal with FOURTH CIRCUIT in Richmond, VA, which on December 22, 2014 affirmed the lower court's EAGLES ruling.

81.     On January 13, 2015, HARR filed with FOURTH CIRCUIT a Petition for Rehearing En Banc which was denied on or about March 10, 2015.

82.     HARR then appealed to the U.S. Supreme Court, and seven months later, on or about October 13, 2015, the highest court refused to hear his case; thus giving finality to HARR's second discrimination/trespassing lawsuit against Duke defendants.

83.     Throughout the entirety of HARR's second lawsuit against Duke defendants, as in his first, there had been absolutely no coverage of it by any media outlets, including Defendants. In other words, since the first lawsuit was filed against Duke defendants on April 5, 2011 until HARR's second lawsuit was refused consideration by the U.S. Supreme Court on October 13, 2015, there had been no media coverage; the public had no awareness about the April 14, 2010 incident that spawned HARR's lawsuits or the two subsequent lawsuits themselves.

84.     Being denied his Seventh Amendment Right to a jury trial and therefore deprived

- 15 -

of his day in court by SCHROEDER's summary judgment on March 5, 2012, HARR decided to file a third lawsuit against Duke defendants and pray that his case would not be assigned to WEBSTER and EAGLES.

85.     On April 11, 2016, HARR manually filed his third discrimination/trespass lawsuit against Duke defendants at the Greensboro Federal Courthouse; this differing from the previous two in that it added Associated Press as a conspiratorial defendant which HARR believed – but lacked proof – worked with Duke defendants in a role to publish a nationwide media story about the anticipated arrest of the NIFONG supporter... the nefarious scheme dissolving when HARR escaped arrest due to COLEMAN's unexpected intervention.

86.     On April 17, 2016, after returning from a trip to the West Coast, HARR found a letter from the Greensboro Federal Court Clerk of Court dated April 12, 2016; it was designated "Standard Preliminary Order for all Civil Cases," and included a notation signifying EAGLES and WEBSTER were assigned to the case.

87.     The following day of April 18, 2016, HARR sent a letter to the Greensboro Clerk requesting the recusal of EAGLES and WEBSTER citing their lack of impartiality.

88.     On April 25, 2016, EAGLES filed an Order to Show Cause which demanded that HARR appear in court in mid-June 2016, to explain why he is not in violation of Federal Rules and why he should not be sanctioned.

89.     On June 2, 2016, EAGLES filed an Order in which she denied HARR's request to have her recuse herself from the case, and denied his Motion to Dismiss the Order to Show Cause. And it reinforced the demand for HARR to appear in court to show cause.

90.     Up until this time, in June 2016, there had been absolutely no media coverage (broadcast or published) by Defendants or any media outlets about the April 14, 2010 failed

- 16 -

discriminatory/trespass plot to arrest HARR or the subsequent lawsuits it spawned beginning with the initial April 5, 2011 filing through the June 2, 2016 Order by EAGLES demanding HARR to show cause. Nothing.

91. HARR had been upset by lack of media coverage generally regarding issues releated to MANGUM's innocence and what he considered newsworthy stories, such as his lawsuit filed against Wake D.A. Lorrin Freeman; and on June 7, 2016, he hand-delivered to Defendant GOODMON a letter and disk expressing his displeasure. *(Exhibit I)*

92. On June 27, 2016, HARR appeared before EAGLES in the Greensboro Federal Court to present his defense, which included a fourteen-page typed explanation of his defense; the document being leafed through but not considered by EAGLES in her ruling at trial.

93. EAGLES' ruling, as documented in her ten-page Order filed June 30, 2016, dismissed HARR's action with prejudice based on *res judicata*, entered a pre-filing injunction (Gatekeeper Order) against HARR, denied HARR access to the Middle District Court of North Carolina without first obtaining leave of the court, and fined him one thousand dollars.

94. On July 1, 2016, EAGLES filed a single page Judgment dismissing, with prejudice, HARR's third discrimination/trespassing complaint against Duke defendants.

95. Gauging the likely futility of an appeal and divided focus on attempting to help MANGUM receive justice, HARR decided to end legal action on this matter.

96. In the ten-page Order and the one-page Judgment issued by EAGLES there is not any mention of the Duke Lacrosse case, MANGUM, NIFONG, the Duke Lacrosse defendants (individually or as a group), the 2006 Duke Lacrosse party, COOPER, or anything related to the Duke Lacrosse incident.

97. As of July 3, 2016, nothing in the media existed related to Duke University's

- 17 -

April 14, 2010 sinister plot against HARR and/or his attempts to seek legal redress.

*98.* On July 4, 2016, HARR saw a local evening news broadcast on Defendants' WRAL-5 News station about the ruling and sanctions by EAGLES, and later he saw an online article on Defendants' WRAL.COM dated July 4, 2016 titled "Court chastises supporter of Duke Lacrosse accuser." *(Exh. A)*

99. HARR found the first paragraph to be particularly malicious and false, it read:

> "A federal court has fined a Durham man and ordered him not to file any more "vexatious and frivolous" lawsuits against Duke University officials over the discredited 2006 sexual assault allegations involving members of the school's lacrosse team."

100. First, HARR was not a "Durham man" as he was not born in, resided in, attended school in, been employed in, voted in, or given his address as being in Durham, NC; his objection to the false reference being that it gave added credibility to the premise that a person would be more emotionally involved in the Duke Lacrosse case if he/she were related to Durham (where the incident took place) than to another city, such as Raleigh.

101. HARR considered the most defamatory falsity being that his lawsuit against Duke University officials was over the 2006 Duke Lacrosse case; clearly a claim by Defendants to avoid truthful mention of the April 14, 2010 ambush of HARR in an unsuccessful attempt by Duke University to have him arrested for being a NIFONG supporter and being an African American. Due to universal media suppression of the April 14, 2010 Duke plot against HARR, the people were unaware of it, and ergo had no reason not to believe HARR's lawsuit was linked to the 2006 Duke Lacrosse case.

102. Defendants' online article's third paragraph read as follows:

> "Harr has said Mangum and Nifong were treated unfairly by the judicial system and the media, and he also has maintained that authorities

- 18 -

falsified the autopsy report of Mangum's boyfriend, whom she was convicted of killing in 2011."

103.    HARR never maintained that authorities (plural) *falsified* the autopsy report; what HARR had consistently averred is that the medical examiner (singular) *produced* a fraudulent autopsy report. Although Mangum's murder case had nothing to do with HARR's lawsuits against Duke Defendants, HARR reasoned it was included to gratuitously vilify MANGUM as a supposed killer and further discredit HARR while protecting the medical examiner and his fraudulent autopsy report.

104.    The fourth falsity in Defendants' July 4, 2016 article was:

"Harr first sued Duke, President Richard Brodhead and other because he felt he was kicked off campus for supporting Nifong. That lawsuit and a second one making similar claims were both dismissed. Yet, he filed a third lawsuit in April."

105.    The verb "supporting" is an action word suggesting that HARR was kicked off campus for something that he *did*. This is untrue as HARR's contention has always been that he was a "supporter of NIFONG" and that his actions were similar to others at the April 2010 event. In other words, HARR felt he was kicked off campus for what he *was*, not what he *did*; a significant difference.

106.    Defendants never made any attempt to contact HARR for his comment or input on his lawsuits against Duke defendants or the incident that initiated them prior to the publication or broadcast of their July 4, 2016 story.

107.    The following day, July 5, 2016, unbeknownst to HARR, *Shitskin Plantation*, one of the most virulent hate-sites online (usually banished once its presence is discovered) that frequently uses the n-word and has its posters and commenters assigned titles of slaveholder or owner, posted a thread titled: "'Justice for Nifong' n-word Sidney Harr told not to file more

vexatious and frivolous lawsuit." The comment consisted of the first two paragraphs of the Defendants' article plus a link to the online WRAL-site article.  *(Exhibit J)*

108.    The next day of July 6, 2016, a commenter with the handle *spookavoider*, who identified himself as an owner, entered what could be considered a threat which read:

> "No worry.  One day, this will be just another nigger found face down in some dirty irrigation ditch, OD'ed on heroin or crack, and no one will miss it, or come to claim the corpse. Hopefully it will happen sooner or later, but it will happen."
> *(Exhibit K)*

109.    The online site *Democratic Underground* also began a thread by posting Defendants' July 4, 2016 article which generated approximately fourteen comments which included: "Guy sounds like a wacko," "He was even nuttier than the folks who still insist 'something happened that night,'" and "Some people haven't gotten the word about O.J., either."

110.    On July 7, 2016, HARR hand-delivered a letter to Randall Kerr (hereinafter "KERR") who was believed to be the general manager at WRAL-5 studio; a letter which pointed out errors in the online July 4, 2016 article and presented corrections which HARR anticipated would be addressed online.  As time went on, it became apparent to HARR that there existed no urgency on behalf of Defendants to address the article's mistakes.  *(Exhibit L)*

111.    Other false, demeaning, and cruel comments were made about HARR based on Defendants' July 4, 2016 article, including a publication one week afterward by the online blog site Fix-the-Court, a self-appointed organization that fancies its mission as being to provide oversight of the U.S. Supreme Court.

112.    A week following Defendants' July 4th article, on July 11, 2016, the Fix-the-Court executive director Gabe Roth (hereinafter "ROTH") wrote an article titled "The justices recused themselves an astounding 180 times last term."  Its last paragraph read as follows:

"Finally, a few justices were named in filings this term. Of the four such suits, three were filed by individuals who showed themselves to be mentally unstable, and the fourth one, tied to the Duke lacrosse scandal of 2006, yielded a Breyer recusal due to the fact that the petitioner, a man named Sidney Harr, accosted the justice after he gave a talk at Duke Law School in 2010. Harr was escorted off campus for the incident and was claiming in his suit that his First Amendment rights were violated by campus police."
*(Exhibit M)*

113.     This article by ROTH, which purposely maligned HARR with its defamatory statements had to have received its information from Defendants' July 4, 2016 online article because no other story had been published or aired about the 2010 incident or its subsequent lawsuits, and there is no other source that links HARR's lawsuit to the Duke Lacrosse case.

114.     HARR managed to come upon the July 11, 2016 Fix-the-Court article after conducting a search on his name; all of which was triggered by his happenstance viewing of the news telecast by WRAL-5 News on July 4, 2016.

115.     The following day of July 12, 2016, HARR sent ROTH a certified letter which emphasized problems with the claim that HARR accosted the justice BREYER, and HARR explained the situation in depth with the expectation that ROTH would expeditiously amend the article. This did not occur despite the magnitude of the false accusation that HARR accosted the justice.

116.     Approximately a week and a half later, on July 23, 2016, HARR sent ROTH a second letter, obviously concerned about the untruthful assertion in the July 11, 2016 Fix-the-Court article that HARR accosted BREYER.

*117.*     Three days later, on July 26, 2016, HARR, while googling his name came upon an earlier December 18, 2015 article by Fix-the-Court titled "Explaining Unexplained Cert.-Stage Recusals at the Supreme Court" in which the April 14, 2010 incident is mentioned... this

- 21 -

without claiming that HARR accosted BREYER. HARR mentioned this to KERR in a letter hand-delivered to him at the WRAL-5 studio that day. *(Exhibit N)*

118.   As of September 13, 2016, there had been no corrections made by Defendants to the July 4, 2016 article, so I hand-delivered a letter along with a copy of a disk containing a sharlog (interactive mini-documentary produced on Flash software) titled "Unabashed mainstream media bias against Nifong, Mangum, Harr." The documentary highlighted errors in the WRAL-5 News July 4, 2016 online article.

119.   Despite correspondence to Defendants, much of which was hand-delivered, HARR was essentially ignored by them. Same outcome with the letters to ROTH which went unanswered.

120.   On September 14, 2016, HARR, having been alerted by his blog site commenters that ROTH had finally deleted mention of HARR and the alleged BREYER incident from the final paragraph of his article, HARR requested of ROTH that he be permitted space on the Fix-the-Court site to set the record straight about what had happened in 2010. ROTH gave no reply.

121.   On December 5, 2016, HARR hand-delivered a final letter to KERR mainly discussing updates on Mangum's case and his lawsuit against Wake County District Attorney Lorrin Freeman (a dereliction of duty lawsuit for ignoring her constituent HARR).

122.   It was around this time in late 2016 that HARR first stumbled upon the *Shitskin Plantation* blog site *(Exh. J, K)* with its hate-speech and threats by white supremacists to whom Defendants had exposed HARR as a black man trying to get criminal charges reinstated against the three white Duke Lacrosse students for the alleged sexual assault of MANGUM. The takeaway from Defendants' July 4, 2016 article being that the essence of HARR's lawsuit in the 2006 was to have the charges of sexual assault back in play... there being absolutely no

- 22 -

knowledge of the true cause for HARR's lawsuit which was related to Duke University's 2010 premeditated attempt to have him arrested for being black and a NIFONG supporter.

123.    Understanding the anger and hatred that Defendants' article elicited from the public by its misleading insinuation that HARR was trying to have the white Duke Lacrosse defendants once again subjected to criminal charges prompted HARR to take legal action with urgency rather than holding out for a resolution before a one-year statute of limitations would expire.

124.    On or about January 3, 2017, HARR initially filed a civil lawsuit against both Defendant WRAL-5/GOODMON and ROTH in the Eastern District Federal Court in Raleigh; but within weeks learned that procedurally Defendants could not be included in a federal diversity lawsuit.  HARR then withdrew Defendants from the federal lawsuit and refiled essentially the same Pro Se lawsuit against Defendants on January 19, 2017 in WAKE COURT. (Though HARR received a signed return receipt from ROTH, ROTH would evade service due to a higher standard of proof-of-service required by the Federal Court.)

125.    Though HARR had established four falsities in Defendants' July 4, 2016 article, his focus was on two false statements:  (1) that the EAGLES' ruling on HARR's lawsuit against Duke defendants was about the 2006 Duke Lacrosse case – this untruth fomenting animus against HARR for a perceived attempt to have the Duke Lacrosse defendants' criminal charges reinstated; and (2) that HARR was a Durham man – this untruth totally unsubstantiated, but by which provided greater credence of HARR's purported involvement (according to the July 4th article) in attempting to redress an outcome in the 2006 Duke case by such activism being carried out by a Durham resident.  These two false statements drove the civil litigation.

126.    The other two false July 4, 2016 statements that HARR "maintained authorities

- 23 -

falsified the autopsy report" and that HARR "felt he was kicked off campus for supporting Nifong" were misleading, but did not engender the contempt or reinforce the detrimental claim that HARR's lawsuit was about the 2006 Duke Lacrosse case. However, by attributing these statements to what HARR felt and what he maintained, HARR believed Defendants should be held to a higher degree of accuracy; especially in light of the fact they did not attempt to reach him for comment.

127. A series of motions were filed by both sides and a Motions Hearing was set to be held in the Wake County Superior Courthouse Civil Division on June 28, 2017, with Honorable Judge Robert Hobgood (hereinafter "HOBGOOD") scheduled to preside.

128. HARR had much confidence in HOBGOOD who he believed to be fair and impartial; HOBGOOD being the only judge HARR considered to have made a favorable motion's ruling in MANGUM's murder case.

129. By the afternoon of June 28, 2017, when HARR's Motions Hearing was set to be heard, HOBGOOD announced that a scheduling problem prevented the hearing from moving forward in his court and that COLLINS would preside over the hearing instead – an announcement at which HARR expressed his displeasure in court.

130. COLLINS, who – unlike HOBGOOD – had no prior knowledge of the case, denied many of the concessions related to the presentations and rulings made by HOBGOOD (in particular halving HARR's requested presentation time and refusing to rule on HARR's request for Summary Judgment because of his failure to file a Notice of Hearing beforehand).

131. Defendants tried to circuitously tie HARR's support for NIFONG, as mentioned in his initial April 5, 2011 lawsuit against Duke defendants, to mean that his civil lawsuit about the April 14, 2010 incident in which Duke University unsuccessfully attempted to arrest HARR

was really about a 2006 criminal case in which he had no standing, and in which MANGUM was not a party.

132. Defendants' response regarding their publication in the July 4, 2016 article describing HARR as a "Durham man" was not to admit to its falsity, but argue that it was not malicious.

133. HARR entered into evidence exhibits in further support of his position with COLLINS deciding to place his ruling in advisement and issue his decision in what he estimated would be several weeks to a month; HARR expecting a ruling around the end of July/beginning of August 2017.

134. On July 17, 2017, COLLINS entered his one-page/two-paragraph/four-sentence Order granting Defendants' Motion to Dismiss; the third decisive sentence reading:

> "The Court finds that the Defendants' Motion to Dismiss should be allowed as to all causes of action and parties, the Court concluding as a matter of law that the Complaint fails to state a claim upon which relief can be granted."

135. WAKE COURT Clerk did not send a copy of the COLLINS Order to HARR, but instead sent it to Charlotte Attorney William H. Cannon (hereinafter "CANNON") who was inexplicably listed as HARR's attorney; an attorney of whom HARR was unfamiliar.

136. It wasn't until more than a week later, on July 25, 2017 after landing at the Sea-Tac airport in Washington state for a family visit that HARR became aware COLLINS had issued his ruling; learning about it from an e-mail from Defendants' counsel, who sent an accompanying postal letter, the body of the letter reading:

> "Some time ago we informed the Court that you were representing yourself, and of course at the hearing you did. However, it appears that for some reason they still have Mr. Cannon listed as your attorney. For

that reason, I am sending you a copy of the Order of the Court granting defendants' Motion to Dismiss."
*(Exhibit O)*

137. Shortly after returning home to Raleigh, HARR certified-mailed on August 3, 2017 and August 9, 2017 respectively, letters to CANNON and Jennifer Knox, the Wake County Clerk of Court requesting information about the mix-up regarding his legal representation status and transfer of mail that should have come to him directly being sent to CANNON. Both ignored HARR; there never being an explanation given to HARR. *(Exhibit P)*

138. On October 20, 2017, HARR filed an Appeal with the North Carolina Court of Appeals with regards to the COLLINS ruling to dismiss his Complaint; HARR's appellate documents not in compliance with the complexities required. Being Pro Se without legal training, HARR, up to this time, had assumed that an appeal would consist of nothing more than a brief; unaware that it required an extensive Record on Appeal, transcripts, and coordination with opposing counsel.

139. On October 26, 2017, while walking through the WRAL-5 News property's parking lot on the way to Dollar Tree in the adjacent mall property, HARR recognized GOODMON who was on his way to his car.

140. HARR introduced himself to GOODMON, mentioned that he did have a lawsuit against him, but spent the majority of time talking about the lack of media coverage on MANGUM, the Duke Lacrosse accuser, and her murder case; this while accompanying him to his car. HARR told GOODMON he was on his way to Dollar Tree.

141. HARR and GOODMON had a seemingly cordial conversation during which GOODMON expressed a willingness to have his reporters look into HARR's concerns and even telling him to contact him if not contacted by a reporter; a security guard materializing just as

- 26 -

their talk was concluding with the observant guard standing a reasonable distance.

142. Upon leaving Dollar Tree moments later HARR noticed the WRAL security guard standing outside as if waiting for a shopper – undoubtedly off WRAL property. This did not cause HARR much discomfort or concern.

143. Several days later, on October 30, 2017, HARR, having not heard from any reporter from WRAL-5 News, went to the studio to leave a packet (containing information about MANGUM's case) for GOODMON. Security on duty initially refused to accept the packet and told HARR to leave the property because he had a lawsuit against WRAL, but then relented and took the packet after HARR explained GOODMON was expecting it.

144. Thereafter HARR never did hear from GOODMON or a reporter, and he made it a practice not to set foot on WRAL-5 News property.

145. That same day, October 30, 2017, HARR's Appeal to the NC Court of Appeals was denied – more likely than not on its procedural noncompliance alone.

146. As things stood, the July 4, 2016 online article by Defendants remained unchanged in its report of false and misleading information – of most concern being the falsehood that HARR's lawsuits against Duke defendants was about the 2006 Duke Lacrosse case, and that HARR was a "Durham man."

147. Meanwhile MANGUM's Pro Se Habeas Corpus Petition was being appealed to FOURTH CIRCUIT with HARR's assistance, and following the North Carolina Prisoner Legal Services abandonment of MANGUM as a client in a January 17, 2017 letter, HARR was reviewing her murder case as well.

148. In late 2017, HARR realized that MANGUM had grounds for a malicious prosecution complaint in civil court against the Durham District Attorney's Office and Durham

- 27 -

Police Officer Marianne Bond on a two-count Larceny of Chose in Action indictment that accompanied the 2011 first-degree murder indictment.

149.     HARR helped MANGUM file the malicious prosecution claim in Durham County Superior Civil Court on January 2, 2018, the basis of her complaint being that there was no probable cause for the charge. The keystone of malicious defendants' defense was that the three-year statute of limitations had expired. This case divided HARR's attention temporarily with his WRAL-5 case.

150.     On May 25, 2018, HARR filed a second similar lawsuit against Defendants with full concession that it was essentially the same as the one he had initially put before WAKE COURT, and as similarly in many respects to his subsequent lawsuits against Duke Defendants, this lawsuit disqualified legitimacy of the initial lawsuit for a *res judicata* defense because the first outcome (which was not by a jury hearing courtroom evidence) was not based on merit.

151.     As in HARR's Duke discrimination/trespass successive cases, Defendants' placed the burden of their argument against the libel and defamation complaint on violations of *res judicata* rather than on merits of the original case and legitimacy and fairness of the COLLINS Order which was bereft of any explanation to support his ruling.

152.     In a September 25, 2018 ruling, Wake County Superior Court Judge Rebecca Holt (hereinafter "HOLT") primarily dismissed HARR's lawsuit citing *res judicata*, with a one-year statute of limitations backup.

153.     On October 19, 2018, HARR filed his Notice of Appeal, and began putting together an appellate packet in full compliance with the NC Appellate Rules of Civil Procedure... this becoming apparent to Defendants' counsel as days passed.

154.     On November 5, 2018, the beginning of the July 4, 2016 online article titled

- 28 -

"Court chastises supporter of Duke Lacrosse accuser" had the following appended to it:

> "Updated: November 5, 2018 — **CORRECTION:** *An earlier version of this story described Sidney Harr as "a Durham man." Harr does not live in Durham."*
> *(Exhibit Q)*

155.    The text in the corrected version omits the word "Durham" and reads "A federal court has fined a man, and ordered him not to file anymore 'vexatious and frivolous' lawsuits..."

156.    With this correction on WRAL.COM's website, which was not extended to all media outlets that carried this online article, Defendants conceded that its earlier version was untruthful with regards to one of two major points of contention by HARR; namely that he was not a Durham resident.

157.    On May 21, 2019, the NC Court of Appeal heard HARR's Appeal, and its three-page unpublished Opinion was filed on June 4, 2019; the Opinion affirming the lower court ruling based on the doctrine of *res judicata*.

158.    On June 17, 2019, HARR filed with the NC Court of Appeals a Petition for a Rehearing En Banc on the opinion filed thirteen days earlier.

159.    On June 24, 2019, HARR filed a Motion for Publication of an Unpublished Opinion with the NC Court of Appeals.

160.    After HARR's Petition for Rehearing En Banc and Motion for Publication were denied, he filed on July 23, 2019, a Petition for Discretionary Review with the NC Supreme Court.

161.    On April 8, 2020, the NC Supreme Court denied HARR's Petition for Discretionary Review, and in response of his failure to receive justice at the state level due to deprivation of his civil and constitutional rights by the courts, HARR filed his Libel and

- 29 -

Defamation Complaint in this U.S. District Court in the Eastern District of North Carolina in Raleigh, NC.

## V. **Analysis and Arguments**

A. Overall view of initial link in a chain of events:

162. In a series of events, in which each successive event reacts to, reflects on, or is a referendum of the one preceding it, it is imperative that the initial event be strong and stable. If an initial occurrence or determination is flawed, all actions in response to it become illegitimate, and that is the case in both of HARR's lawsuits... his 2011 lawsuit against Duke defendants regarding a 2010 incident, and his 2017 lawsuit against Defendants regarding a 2016 incident.

163. HARR's position is that the 2011 initial lawsuit's summary judgment outcome by SCHROEDER was flawed because the Court's assertion that the events regarding the discriminatory action against HARR took place on *private* property precluded redress was countered by HARR's argument that the discriminatory event, though on *private* property, was at a public event which transformed the *private* property into a place of public accommodation in which HARR was acting as all others similarly situated.

164. The 2017 initial lawsuit's summary judgment outcome by COLLINS was flawed to such an extreme that the Court could not even offer a legal, logical, or moral reason to support its ruling. Subsequently all rulings of substance which followed are irreparably tainted. Because HARR's appeals to the NC Court of Appeals in the libel/defamation case were profoundly deficient, their denials were procedurally based rather than upon their merit.

165. When HARR filed his second lawsuit in the libel/defamation case the flawed initial outcome tarnished the subsequent HOLT ruling based on *res judicata*. In that case, HOLT

disregarded HARR's argument (that the initial Complaint's COLLINS Order lacked merit) when she issued her ruling based on *res judicata*.

166.    HARR's filing of his appeal to HOLT's ruling was in procedural compliance with the complex process, thereby enabling both the NC Court of Appeals and NC Supreme Court to make rulings based on merit of the appeal and not simply dismiss it based on procedural imperfections. HARR's position is that both judicial appellate bodies erred by not considering the totality of the *res judicata* doctrine which includes the demand that the initial case's outcome be decided on **merit**. The COLLINS ruling was not based on merit.

167.    Put another way, using an architectural analogy, if the foundation of a structure is unsound, then the remainder of the construction – regardless of its craftsmanship – is defective. In the libel/defamation case, the COLLINS ruling represents a foundation built of clay... not one of concrete mixed properly with correct proportions of cement, water, and aggregate, allowed to set under proper conditions, and reinforced with appropriately sized and positioned re-bar. So, when the building blocks of *res judicata* are applied, regardless of the precision and workmanship of the masonry itself, the entirety of the building remains deficient and uninhabitable because of its unstable foundation. HOLT's ruling is unstable.

B.  Element of merit in *Res Judicata* is missing:

168.    The WexLaw dictionary gives the following definition for *res judicata*, which is widely accepted:

> "Generally, *res judicata* is the principle that a cause of action may not
> be relitigated once it has been judged on the merits."

169.    The sole and requisite element for a *res judicata* ruling is that the initial case litigated be decided or judged on its **merits**. This is the argument HARR has presented all along

but which the Courts have thus far elected to disregard. In his one-page/two-paragraph/four-sentence Order, COLLINS provides no legal or ethical justification for his summary judgment ruling to dismiss HARR's civil Complaint. (In comparison, SCHROEDER filed an eight-page Order in which he presented reasons for his decision.)

170.   Its failure to offer evidence or legally based reasoning for a ruling makes COLLINS' ruling devoid of merit when challenged by the aggrieved party. In the COLLINS ruling, what gives prominence to his single-page Order in determining its merit is the fact that he took the case under advisement to allow him time to review documents, including those submitted by HARR, before issuing his ruling; ergo, the trial transcripts do not contain reasoning on the case's merit because the ruling at the Hearing did not come immediately from the bench. The single-page Order by COLLINS is the only source by which to evaluate the merits of his ruling... and such merits do not exist.

171.   Using the above referenced WexLaw definition of *res judicata*, conversely if a cause of action is not judged on its merits (as in the COLLINS ruling), then it can be relitigated. All *res judicata* legal definitions require that the initial cause of action be judged on its merits; they do not simply read "a cause of action may not be relitigated once it has been judged."

172.   By invoking Rule 12 (b) (6) of NC Rules of Civil Procedure, namely that HARR failed to state a claim upon which relief could be granted, COLLINS is affirming that Defendants did not libel and defame HARR in their July 4, 2016 article because the two contested statements are true, that is COLLINS, by his ruling, asserts: (1) HARR's lawsuits against Duke defendants were about the discredited 2006 Duke Lacrosse case; and (2) HARR is a Durham man.

C.   COLLINS' ruling is legally baseless and inherently flawed:

173.   Regarding Defendants' July 4, 2016 article, its claim that HARR's lawsuits

- 32 -

against Duke defendants was about the discredited 2006 Duke Lacrosse case is, if anything else, and impossibility. First of all, the 2006 Duke Lacrosse case was a criminal case wherein the defendants were three Duke Lacrosse student/athletes – Reade Seligmann, Collin Finnerty, and Dave Evans who were accused of sexually assaulting MANGUM; the State of North Carolina was the prosecutor. MANGUM was not a party in that case, but rather a witness and likely victim in it. NIFONG led the prosecution of the case until forced to relinquish control to the Attorney General's Office in January 2007 following a grievance investigation into his handling of the case early-on by BAR. Additionally the Duke defendants (BRODHEAD, LEVI, and Duke University) were not a party in the criminal case. As important, HARR had no legal standing in the 2006 criminal case in which all criminal charges were dropped by the NC Attorney General's Office in April 2007.

174.    The series of lawsuits HARR filed against Duke defendants beginning in April 2011, stemming from an April 2010 discrimination/trespass premeditated incident in which Duke attempted to have HARR arrested on trumped up charges, were civil and not criminal. The defendants in HARR's 2010 case (BRODHEAD, LEVI, and Duke University) were not materially connected to the 2006 Duke Lacrosse case. Bottom line is that there is no nexus between HARR's 2011 discrimination/trespass civil lawsuit against Duke defendants and the 2006 alleged sexual assault criminal case involving the three Duke Lacrosse defendants.

175.    Considering the timeline, the Duke Lacrosse case began with the March 13, 2006 Duke Lacrosse party and was effectively terminated on April 11, 2007 when COOPER, during his promulgation, dropped all criminal investigations and declared the three Duke Lacrosse defendants innocent... almost four years prior to HARR's initial filing. Practically, if HARR's lawsuit against Duke defendants was truly about the Duke Lacrosse case, a defense of untimely

filing for a three-year statute of limitations violation would likely be the first defense advanced. That the Duke defendants never utilized such a defense additionally disproves the Duke Lacrosse case as being the incident responsible for triggering the HARR civil lawsuit.

176. Whereas the major assertion in the Defendants' July 4, 2016 article is that EAGLES chastised HARR for his repeated lawsuits "over the discredited 2006 sexual assault allegations involving members of the school's (Duke University) lacrosse team" the fact is that there is no mention in her June 30, 2016 ten-page Order of the Duke Lacrosse case, NIFONG, MANGUM, the three Duke Lacrosse defendants, or anything related to the March 13, 2006 party and/or its aftermath.

177. Not only is the July 17, 2017 COLLINS ruling lacking in merit, but the process of HARR's Complaint was marred by WAKE COURT's Clerk of Court's Office (hereinafter "WAKE CLERK").

D. Procedural malfeasances by WAKE CLERK

178. It was on July 25, 2017 when first notified by an e-mail from Defendants' counsel that Pro Se litigant HARR first learned WAKE CLERK had falsely designated him as being legally represented in his initial January 19, 2017 libel/defamation lawsuit by CANNON, a Charlotte-based attorney (of whom HARR had never heard), and that all official court correspondence intended for HARR had been/was being sent to CANNON at a Charlotte address HARR did not recognize. WAKE CLERK did not even send HARR a copy of the COLLINS July 17, 2017 ruling; HARR finding out about the dismissal of his lawsuit more than a week after its issuance when Defendants' legal counsel sent him a copy of the COLLINS Order. *(Exh. O)*

179. This had a significant consequence for HARR because by being designated as having professional legal representation, he was precluded from receiving notices from the

Court, such as the Roseboro letter, for the purpose of assisting Pro Se litigants through the overbearing legal maze confronting most individuals who are not legally trained.

180.     Even had such notifications been intended for him, he would never have received them because they were sent to a Charlotte address with which HARR was unfamiliar.

181.     These two blatant mistakes by WAKE CLERK in the processing of HARR's initial libel/defamation case against Defendants placed him at a huge disadvantage he could little afford.

182.     The correspondence from the WAKE CLERK that should have been delivered to HARR, was never forwarded by CANNON or whoever was in receipt of it.

183.     Shortly after learning of the malfeasances by WAKE CLERK, HARR wrote to both WAKE CLERK and CANNON (at its online address) seeking an explanation for the mishap, but did not receive the courtesy of a response.

184.     Despite the inexplicable misconduct by WAKE CLERK, HARR is being held to a higher standard than the governmental judicial office by many adjudicators who demand that he stringently adhere to all protocols in his filings while turning a blind eye to misdeeds such as that committed by WAKE CLERK that could have a bearing on HARR's chances to prevail in court.

185.     The COLLINS July 17, 2017 ruling lacked merit, and the WAKE CLERK mishandled HARR's Complaint, however Defendants inherent media connection posed a particularly challenging obstacle to HARR in seeking justice.

E.  Malice by Defendants and the media against HARR:

186.     The Freedictionary defines malice as follows:

> "In its legal application, the term *malice* is comprehensive and applies to any legal act that is committed intentionally without just cause or excuse. It does not necessarily imply personal hatred or ill feelings, but

- 35 -

rather, it focuses on the mental state that is in reckless disregard of the
law in general and of the legal rights of others."

187.    Defendants, in their July 4, 2016 article, acted with malice against HARR because

they intentionally made statements about him (that his case against Duke defendants was over

the discredited 2006 Duke Lacrosse case and that he was a Durham man) that they knew to be

false; statements made without just cause.

188.    Consider that since the April 14, 2010 attempted arrest incident neither

Defendants nor any other media covered the story and/or its legal aftermath until July 4, 2016

when Defendants' article wrote about the legal aftermath but attributed the case to a 2006

incident. Defendants wanted to discredit HARR by publishing admonitions by EAGLES

describing HARR's legal filings as being vexatious and frivolous while at the same time not

mentioning Duke defendants' cruel and premeditated plan to arrest HARR which was thwarted

only by the timely fortuitous appearance of COLEMAN.

189.    ROTH's July 11, 2016 Fix-the-Court account was far more malicious as he

falsely stated HARR had accosted BREYER at the 2014 event; allowing the defamatory

statement to sit prominently in a featured story for two months before removing the libelous

comment.

190.    Unlike Defendants and ROTH, other media outlet most likely decided to steer

clear of the 2010 discrimination/trespass incident involving HARR and its legal repercussions

because it put Duke defendants in a bad light and legitimized HARR as the victim.

191.    After not covering the 2010 discrimination/trespass incident and its lawsuits for

more than six years, what may have provoked Defendants to publish the July 4, 2016 story could

very well have been a letter HARR wrote and hand-delivered to Defendant GOODMON less

than a month earlier on June 7, 2016 with a topic "Media coverage of Crystal Mangum and

- 36 -

related stories." The three-page letter was somewhat scathing in its criticism of WRAL-5 News and other media outlets for their concerted efforts to suppress the truths about MANGUM's innocence in a 2013 second-degree murder conviction of her boyfriend in his 2011 death. Also, HARR alleged in his letter that Defendants' media placed concern in abuse of a dog over that of the black life of an innocent African American female wrongly prosecuted, convicted, and serving a lengthy sentence as payback for accusations of sexual assault made a decade earlier.

192.    It is undeniable that Defendants and other media outlets have made false statements against MANGUM, for whom HARR is advocating. Not only have they made unsubstantiated claims that she made false accusations about being sexually assaulted in 2006, but they have stated as fact that MANGUM's boyfriend died directly from a wound she inflicted.

193.    For example, one online WRAL-5 News article on November 22, 2013 had the headline "Mangum found guilty in boyfriend's stabbing death." Another online WRAL-5 News article of December 31, 2014 was titled "Mangum appeals murder conviction in boyfriend's stabbing death." The fact is that MANGUM's boyfriend did not die of a stab wound... he died from an errant esophageal intubation (which is invariably fatal if not timely removed and replaced properly in the airway) placed by Duke University Hospital staff.    *(Exhibit R)*

194.    In an October 25, 2019 report, world-renowned forensic pathologist Dr. Cyril H. Wecht (hereinafter "DR. WECHT") reviewed the April 14, 2011 autopsy report of MANGUM's boyfriend and determined that the manner of death was an ***accident*** due to medical malpractice by Duke University Hospital, and ***not*** a homicide secondary to complications of a stab wound to his chest. The ramification of this determination is that MANGUM has been prosecuted, convicted, and served more than eight years and six months for a crime she not only did not commit, but for a crime that never even took place.

195. DR. WECHT concludes his eight-page report by stating that the opinions regarding the manner/cause of death by the medical examiner and defense expert witness are unreliable because their reports contain significant discrepancies when compared with the medical records. *(Exhibit S)*

196. On October 31, 2019, HARR began immediately notifying many media of the October 25, 2019 report by DR. WECHT; giving notice to WRAL-5 News anchor David Crabtree by e-mail with a subject of "Dr. Cyril H. Wecht's report on Crystal Mangum's murder case" dated November 6, 2019 and a copy of this e-mail sent to WRAL-5 anchor Debra Morgan and WRAL-5 anchor/reporter Amanda Lamb. No story was generated from these e-mails. *(Exhibit T)*

197. The reason this story of DR. WECHT's report is suppressed by Defendants and other media is because it is exonerative in support of MANGUM's innocence in the death of her boyfriend; it goes even further to aver that she has spent one fifth of her life in prison for a crime that wasn't even committed... a story Defendants and other media don't want the people to know.

198. The other thing DR. WECHT's report does is throw cold water on the false claims by Defendants and other media types, including the Associated Press, is that MANGUM's boyfriend died of a stabbing or was fatally stabbed. The report makes it clear that the instrument of MANGUM's boyfriend's death was an endotracheal tube and not a steak knife.

199. If Defendants had integrity, courage, and/or an ounce of humanity, they would live up to their journalistic ethics and report the newsworthy story that would likely lead to the release and vindication of the Duke Lacrosse accuser and enable her to return to her three children who have/are suffering without her being a mother in their lives; an outcome that is not desired by many.

- 38 -

200.    For the blockade of DR. WECHT's report to be effectively enforced, all media must be engaged – which they have been since there has not been a single story aired or published by any media about DR. WECHT's report after more than eight months. Many media types have been contacted by HARR, including CBS and its *60 Minutes* producer, CBS legal analyst Rikki Klieman, as well as *Court TV Live* anchors Vinnie Politan, Ted Rowlands, and Julie Grant. (Note: Court TV has interviewed DR. WECHT by Skype regarding the Ahmaud Arbery case and the Lori Vallow Daybell doomsday cult mom case... but never asked the famed physician/attorney about MANGUM's murder case.)  *(Exhibit U)*

201.    Just as Defendants have maliciously treated MANGUM and intentionally allowing her to languish in prison with knowledge of her innocence, they have similarly made maliciously false statements about HARR for the purpose of discrediting him and having him subjected to ridicule, scorn, and hatred.

202.    The only reason Defendants made a concession with its November 5, 2018 correction about HARR not living in Durham was to mitigate an appeal on HOLT's ruling that seemed to be clearing the complexities of the appellate process and thereby warranting a review of the appeal based on merit.

F. Defendants' concession to truth regarding "Durham man":

203.    The falsity of referencing HARR as a "Durham man" should have been immediately corrected when brought to Defendants' attention, especially since they had nothing upon which to make the claim. Instead, Defendants held on to their statement that HARR was a Durham man during the 2017 hearing by COLLINS and the 2018 hearing by HOLT. Because Defendants admitted the falsity of the "Durham man" claim after rulings by COLLINS and

- 39 -

HOLT, that, in and of itself, should carry significant weight in dispelling the integrity of both rulings.

204. By Defendants' updated admission by way of the November 5, 2018 correction regarding the falsity of its previous declaration that HARR was a "Durham man" brings into question the veracity of its other major contested contention that HARR's Duke lawsuits were about the 2006 Duke Lacrosse case through the Latin axiom "falsus in uno, falsus in omnibus." Yet, but another reason to invalidate Defendants' July 4, 2016 claim that HARR's lawsuit was about the 2006 discredited Duke Lacrosse case.

205. Clearly the admission was one made with much reluctance on the part of Defendants because it helped prop up the illusion that a person would be so emotionally vested in the criminal Duke Lacrosse case to go to extremes of challenging its outcome. The only reasonable challenge to the outcome of the 2007 dismissal of all criminal charges by COOPER would be re-instatement of the criminal case against the three Duke Lacrosse defendants.

G. Judges need to be held accountable:

206. In most courtroom contests, laws can be found to support both sides of an argument, with adjudicators hopefully coming down on the side that is most just. There are cases to the extreme wherein justification is totally lacking to support one side of a cause of action.

207. Such is the situation that faced COLLINS when the desired outcome with which he eventually ruled in favor could not be supported by any legal precedent, law, or logic; specifically to grant Defendants' summary Motion to Dismiss HARR's libel/defamation lawsuit which was buttressed by the facts disproving the malicious publications in the Defendants'

online article of July 4, 2016. Though not required, HARR additionally produced evidence of the damages he sustained as a direct result of Defendants' article.

208.    That COLLINS was unable to justify his ruling in granting the summary motion was evidenced by the fact that he did not; he did not because he could not. There was absolutely no way for him to even fake a supporting citation or situation to comply with Rule 12 (b) (6).

209.    Even SCHROEDER utilized arguments in his eight-page Order dated March 5, 2012 in summarily dismissing HARR's discrimination complaint against Duke defendants.

210.    Without transcript clues as to his reasoning, COLLINS' single-page/four-sentence Order, which essentially recites Rule 12 (b) (6), provides no indication as to any merit in his ruling.

211.    Clearly COLLINS had two better alternatives to consider in this case rather than grant Defendants' Motion to Dismiss: (1) grant HARR's Motion for Summary Judgment supported by evidence and facts; or (2) deny both summary judgments and allow the case to proceed to trial before a jury.

212.    All HARR sought with the filing of his initial Complaint was the guarantee of his Seventh Amendment Right to a jury trial to redress the injustices and damages of Defendants; whereas Defendants were relying on the COLLINS Court to dismiss HARR's Complaint which, under the circumstances, offered their best, if not only, chance to prevail.

## VI. Conclusion

213.    There are some legal cases in which fairness and justice are in conflict with the rule of law, but THIS CASE is not one. In merely seeking his day in court, HARR's right to a jury trial is overwhelmingly supported by what is morally just, in addition to the strictest interpretations of the law. What happened in the seminal COLLINS case is that the Court could

not even find a law to support a desired outcome, which explains the length of his one-page/two-paragraph/four-sentence Order of July 17, 2017.

214.    Regardless, the desired outcome of any case should ideally be justice with the rule of law forging the path to such a result. Adherence to the rule of law at the expense of justice should not be the overriding goal according to the Supreme Court of Florida which stated in its Opinion in the case of *Strazzulla v. Hendrick*:

> "We think it should be made clear, however, that an appellate court should reconsider a point of law previously decided on a former appeal only as a matter of grace, and not as a matter of right; and that an exception to the general rule binding the parties to "the law of the case" at the retrial and at all subsequent proceedings should not be made except in unusual circumstances and for the most cogent reasons and always, of course, only where "manifest injustice" will result from a strict and rigid adherence to the rule."

215.    COLLINS' denial of HARR's opportunity to redress the offenses against him by Defendants represents a manifest injustice by WAKE COURT that is arbitrary, unfair, malevolent, and not supported by the rule of law. HARR is seeking neither advantage nor even a level playing field; since April 5, 2011 HARR has been merely trying to gain access onto the field in order to fairly compete.

## VI. Relief sought

Whereas PLAINTIFF Pro Se HARR has been deprived of his Seventh Amendment Right to a jury trial to redress injuries brought on by Defendants, he respectfully requests of THIS COURT the following relief:

1. to have his day in court… that being a civil trial before a jury of his peers;

2. if prevailing, to receive reasonable restorative compensation by Defendants deemed appropriate by THIS COURT through adequate media coverage on suppressed stories

- 42 -

that are indisputably newsworthy;

3. if prevailing, to receive reasonable financial compensation by Defendants; and

4. if prevailing, to receive any other such relief, including punitive, as THIS COURT deems fair and warranted.

Respectfully submitted this 9th day of July, in the year 2020.

Sidney B. Harr, Plaintiff Pro Se

116 Saint Mary's Street, # 703
Raleigh, NC 27605
Phone: (919) 601-1817
E-mail: justice4nifong@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2020, I manually filed a Complaint on Civil Rights Violation, Libel, and Defamation against Defendants Jim Goodmon and WRAL-5 News with the U.S. District Court in the Eastern Division of North Carolina, Raleigh.

In addition, I certify that I served a copy of this memorandum via first class mail, postage prepaid upon Defendants legal counsel:

C. Amanda Martin
1101 Haynes Street, Suite 100
Raleigh, NC 27604-1455

This the 9th day of July, 2020.

Sidney B. Harr, Plaintiff Pro Se

116 Saint Mary's Street
# 703
Raleigh, NC 27605
919.601.1817
justice4nifong@gmail.com